Scott A. Rosenberg, P.C.
265 Post Avenue
Suite 120
Westbury, New York 11590
(516) 877-7205
Attorneys for Plaintiffs
Kevin R. Toole (KT-7700)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTTRICT OF NEW YORK**

------------------------------------------------------------------------x

ANTHONY IANNUZZI and THERESA IANNUZZI,

                                    Plaintiffs,                Case No. 07 cv 0964 (JFB)(WDW)

              -against-

WASHINGTON MUTUAL BANK, AMERICAN        AMENDED COMPLAINT
MORTGAGE NETWORK, INC., d/b/a AMNET
MORTGAGE, MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., CUSTOM
CAPITAL CORP., PETER J. DAWSON,
BMG ADVISORY SERVICES, LTD., BRASH
MANAGEMENT GROUP, LTD,
21 ST CENTURY FINANCIAL SERVICES and
INVEST FINANCIAL SERVICES,

                                Defendants.

------------------------------------------------------------------------x

      The Plaintiffs, by and through their attorneys, SCOTT A. ROSENBERG, P.C., pursuant to this amended complaint, hereby assert as against the party defendants as follows:

      1.     Plaintiffs Anthony Iannuzzi and Theresa Iannuzzi (the "Plaintiffs") are husband and wife and reside at 209 Fulton Street, Westbury, New York.

      2.     Upon information and belief, and at all times hereinafter mentioned, defendant Washington Mutual Bank ("WMB") is a banking institution duly authorized to conduct business in the State of New York by the New York State Banking Department.

3.      Upon information and belief, and at all times hereinafter mentioned, defendant American Mortgage Network, Inc., d/b/a AMNET Mortgage ("AMNET") is a mortgage banker or mortgage broker duly authorized to conduct business in the State of New York by the New York State Banking Department and is a wholly owned subsidiary of Wachovia Bank, NA.

4.      Upon information and belief, and at all times hereinafter mentioned, defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a foreign corporation duly authorized to conduct business in the State of New York.

5.      Upon information and belief, and at all times hereinafter mentioned, defendant Custom Capital Corp. ("CCC") is a licensed mortgage broker duly licensed by the New York State Department of Banking and is a domestic corporation doing business in the State of New York.

6.      Upon information and belief, and at all times hereinafter mentioned, defendant Peter J. Dawson ("Dawson") resides in Huntington, New York and conducted business, individually and through various entities with an office located at 384 Reckson Plaza, Uniondale, New York.

7.      Upon information and belief, and at all times hereinafter mentioned, defendant BMG Advisory Services, Ltd. ("BMG") was a New York corporation, or an unincorporated business entity doing business in the State of New York with offices located at 384 Reckson Plaza, Uniondale, New York.

8.      Upon information and belief, and at all times hereinafter mentioned, defendant Brash Management Group, Ltd. ("Brash") was a New York corporation, or an unincorporated business entity doing business in the State of New York with offices located at 384 Reckson Plaza, Uniondale, New York.

9.   The Plaintiffs hereby assert causes of action for (i) declaratory relief, (ii) permanent injunction, (iii) breach of contract, (iv) misappropriation and conversion, (v) fraud and misrepresentation, (vi) breach of fiduciary duty, and (vii) accounting.

10.   This Court has jurisdiction over this case and the parties named herein pursuant to 28 U.S.C. §1331 on the basis of federal question.

11.   Venue in this Court is proper pursuant to 28 U.S.C. §1391(b).

12.   Jury trial is demanded.

### GENERAL ALLEGATIONS REGARDING DAWSON AND BMG

13.   Upon information and belief, commencing during the 1990's and through 2006, Dawson conducted business as a financial advisor, investment manager and mortgage broker. From time to time Dawson may have operated this business through one or more entities, including but not necessarily limited to, BMG, Brash, 21st Century and Invest.

14.   Upon information and belief, Dawson held various licenses and certifications directly, or indirectly with 21st Century Financial Services and Invest Financial Services, through the National Association of Securities Dealers, Inc. (NASD).

15.   Upon information and belief, Dawson utilized his businesses in an elaborate scheme whereby he would target retired and elderly individuals and couples and solicit them as clients in order to gain access to their savings, investments and equity in real property.  Dawson would represent to these clients that he would oversee and manage all of their financial affairs, including investments, bill paying, mortgages and tax preparations.

16.   Upon information and belief, once Dawson gained access to a client's financial records and resources, he would structure investments, mortgages, equity lines of credit and other financial vehicles in such way and under his control so that he would have direct access to the assets, deposits, income, and loan proceeds that would otherwise have been available to the client.

17.     Upon information and belief, through the schemes and structures developed and implemented by Dawson, over a period of years he has diverted, converted and stolen millions of dollars from his clients.

## ALLEGATIONS SPECIFIC TO THE PLAINTIFFS

Investments

18.     Plaintiffs began using Dawson approximately 15 years ago to prepare their federal and state tax returns.   At no time did it appear to Plaintiffs that there was anything irregular or improper in the way Dawson prepared the returns and Plaintiffs have never been audited on any federal or state return.

19.     After a period of years while Dawson was preparing their tax returns, he began to discuss with Plaintiffs possible investments that he could place them in.   Starting in 2000, Plaintiffs turned over certain monies to Dawson for purposes of him establishing investment plans for them.   Dawson opened accounts on behalf of Plaintiffs first with Oppenheimer Funds, then successively with AXA Equitable, MainStay Investments-New York Life and Eaton Vance Managed Investments.   All of theses investments, which included value and blue chip growth funds with MainStay, high yield and small cap growth funds with AXA and managed growth funds with Eaton Vance, managed by Dawson, including during the time that he held positions at 21st Century Financial Services and later Invest Financial Services.

20.     During the terms of these investments and up to approximately the fourth (4th) quarter 2004 Plaintiffs did receive periodic account statements from the investment firms and regular dividends or returns on the investments from Dawson by checks drawn on an account of Dawson or one of his companies.   Alternatively, from time to time such dividends or returns were reinvested upon the advice of Dawson who effectuated such transactions on behalf of Plaintiffs.

21.     In late 2004, the remaining account of Plaintiffs managed by Dawson maintained with Eaton Vance had a balance in excess of $14,500 (the "Balance").   Upon the advice of Dawson, Plaintiffs agreed that Dawson would closeout the Eaton Vance account and transfer the account funds into a new investment vehicle with a different entity.

22.     Upon information and belief, thereafter, Dawson caused the Eaton Vance account to be closed.  However, Dawson never advised Plaintiffs of any details concerning the supposed new investment he was to have invested the funds Dawson received from the Eaton Vance account. Further, Plaintiffs never received any account statements either from Dawson or an investment firm with respect to the new account that was to have been opened by Dawson on behalf and for the benefit of Plaintiffs.

23.     Plaintiffs did continue to receive monthly checks from Dawson in the approximate amount of $600 per month for what plaintiffs believed were dividends or returns on the new investment Dawson was supposed to set up for them.  The monthly checks continued through October 2006, however, the November 2006 check was dishonored by Plaintiffs' bank for insufficient funds.  Plaintiffs did not receive any further checks from Dawson and Plaintiffs have not received the Balance that was withdrawn from the Eaton Vance account by Dawson, or any portion thereof.  Dawson has never advised Plaintiffs where the funds were deposited.

<u>Mortgage</u>

24.     In early 2006 Dawson discussed with Plaintiffs the possibility of them obtaining a reverse mortgage on their personal residence property at 209 Fulton Street, Westbury, New York (the "Property").  A reverse mortgage is a form of mortgage that enables certain homeowners, usually retired individuals or senior citizens to draw the equity from their property in the form of monthly payments. Generally, no payments or finance charges are due on the loan underlying the mortgage until the owner sells the property, moves out of the property or dies. This type of

mortgage was attractive to Plaintiffs because they had a significant amount of equity built up in their home and it would give them a secure monthly income on top of pension benefits, investment dividends and social security income.

25.     Based on Dawson's recommendation and the information he provided to them regarding possible reverse mortgages, Plaintiffs decided to attempt to obtain a reverse mortgage. Dawson advised Plaintiffs that he would make arrangements for Plaintiffs to work with a mortgage broker that he had a working relationship with.  Plaintiffs believed that Dawson was acting as a mortgage broker himself, or as a loan officer for the mortgage broker in the proposed reverse mortgage transaction.

26.     In addition to the initial discussions with Dawson regarding a possible mortgage, Dawson introduced Plaintiff Anthony Iannuzzi to Michael Laucella ("Laucella") of CCC at Dawson's offices.  Upon information and belief, Dawson and Laucella had a relationship prior to Laucella's employment with CCC.  Dawson told Plaintiff Anthony Iannuzzi that he had a working relationship with CCC and that Laucella would handle the mortgage process for Plaintiffs.

27.     Dawson and CCC had transacted approximately 18 mortgages for clients of Dawson prior to Dawson's introduction of Laucella to Plaintiff Anthony Iannuzzi.  When referring mortgage clients to CCC Dawson only dealt with Laucella.  Laucella was a convicted felon who had served prison terms for securities and other financial crimes prior to his becoming employed by CCC.  The fact of Laucella's criminal record was never disclosed by Dawson, Laucalla or CCC to Plaintiffs.  Upon information and belief, when Dawson referred Plaintiffs to CCC he told Laucella to "treat them very well, get them the best, limit the expenses... And don't lie on the application."

28.     Plaintiff Anthony Iannuzzi met with Laucella at Dawson's offices the day that Dawson made the introductions.  Plaintiffs understood Laucella to be a representative or employee

6

of CCC, the mortgage broker that Dawson recommended to obtain a reverse mortgage for Plaintiffs.      There may have been a subsequent telephonic communication between a representative of CCC and Plaintiffs.

29.      During the communications with CCC Plaintiffs were asked a limited number of superficial questions that did not encompass the scope of information and documentation that would be required to fully complete an application for a mortgage of any kind.   At no time did anyone from CCC make any other request, whether written or oral, to Plaintiffs for any information pertaining to an application for a mortgage of any kind.   At no time did Laucella or any other person at CCC advise Plaintiffs of any role or participation by Dawson in the mortgage process after Dawson's introduction of Laucella to Plaintiff Anthony Iannuzzi.

30.      Plaintiffs believed that CCC was handling the mortgage process for them and that it was seeking to obtain the best mortgage product for them, which based on their discussions with Dawson, they believed to be some form of a reverse mortgage.   Based upon Dawson's statements to them and the conduct of Laucella in the discussion he had with Plaintiff Anthony Iannuzzi, Plaintiffs had the understanding that CCC was acting as their mortgage broker to obtain the best possible reverse mortgage product for them.   Plaintiffs relied upon CCC to act as their mortgage broker and expected CCC to do the best for them in obtaining a mortgage.

31.      The services that Plaintiffs understood that would provide to, or on behalf of Plaintiffs by the mortgage broker, included, but were not necessarily limited to: (i) discussing with Plaintiffs the nature, type and amount of the mortgage product that would be obtained and selecting the best possible mortgage product for Plaintiffs given Plaintiffs' circumstances, which upon information and belief, had been told to Laucella by Dawson and Plaintiff Anthony Iannuzzi; (ii) locating a lender (AMNET); (iii) properly and fully preparing the URLA and any other information related thereto; (iv) confirming to Plaintiffs that the URLA had been submitted to a lender; (v) disclosing

to Plaintiffs the existence of the CCC Fees and that they would be charged to Plaintiffs; and (vi) advising Plaintiffs when a mortgage had been approved.

32.     In the ordinary course of the mortgage broker business in New York State it is required that a mortgage broker and potential borrower enter in to a pre-application disclosure and fee agreement ("Fee Agreement").  Without such a Fee Agreement, mortgage brokers cannot be paid fees from the proceeds of a mortgage loan.

33.     Upon information and belief, a Uniform Residential Loan Application for Plaintiffs was prepared by CCC and submitted to AMNET (the "URLA").  A copy of the URLA is annexed hereto as Exhibit "A."   However, the URLA did not contained very little of the requisite information in the various sections pertaining to employment status and income, monthly income and assets and liabilities.  Further, the URLA required that if there were co-applicants that they sign the URLA on the first page acknowledging that the application was made on a joint credit basis.  The URLA did not have the signatures of Plaintiffs at the required section, but rather, their names were printed on the signature lines in hand writing that was not either of Plaintiffs.

34.     Apparently Laucella had the Plaintiffs sign a blank or incomplete URLA on the last page of the application which signatures were dated May 8, 2006.  Upon information and belief, and based on documentary evidence, it appears that CCC forwarded the incomplete URLA to AMNET on or before May 5, 2006, as indicated by a received date stamp on the aforesaid signature page of the URLA, and three days before Plaintiffs actually signed the URLA.  A later version of the URLA that was dated May 16, 2006 (the date of the mortgage closing) states that the URLA was prepared by Laucella, as an agent of CCC.

35.     CCC's failure to obtain all necessary and appropriate information and documentation to properly and completely prepare the URLA and CCC's forwarding of the incomplete and partially unexecuted URLA to AMNET, and its failure to discuss with Plaintiffs the type of

mortgage that was to be applied for by the URLA were acts grossly inconsistent with normal, accepted and proper practices in the mortgage broker and banking industry.  Such actions of CCC were done in complete disregard of the interests and rights of Plaintiffs who based on the fiduciary relationship between them and CCC, were entitled to know from CCC the type of mortgage being applied for and to review a completed URLA and ensure that all information and documentation contained in the URLA or that was to be submitted with the URLA was complete, accurate and fully stated.

36.    In violation of the Truth in Lending Act (15 U.S.C. §1601, *et seq.*) ("TILA") and the Real Estate Settlement Procedures Act (12 U.S.C. §2601, *et seq.*) ("RESPA"), at no time during the process did Plaintiffs receive from Dawson, CCC, or any other party, including AMNET and its agents, both disclosed and undisclosed, any information or documents pertaining to the proposed transaction, including, but not limited to a (i) Good Faith Estimate of Fees, (ii) Truth in Lending Disclosure, (iii) Commitment Letter, (iv) Broker Agreement, and (v) any other documents required prior to a closing advising about the transaction and the entities involved required under TILA or RESPA.

37.    Upon information and belief, AMNET, or its agents, prepared a package of documents, with a cover letter dated May 5, 2006 addressed to Plaintiff Anthony Iannuzzi, but not to Plaintiff Theresa Iannuzzi, purportedly containing a good faith estimate, initial truth in lending disclosure, initial servicing disclosure, credit score notice, application disclosure, NY interest rate disclosure and settlement costs booklet, each only identifying Plaintiff Anthony Iannuzzi as the borrower (the "May 5 Package").  A copy of the May 5 Package is annexed hereto as Exhibit "B." Plaintiffs never received the May 5 Package and were never advised by CCC or Dawson that such a package would be sent to them.  Further, upon information and belief, no such package was

prepared for and addressed to Plaintiff Theresa Iannuzzi despite the fact that she signed the URLA, and was an obligor on the Note (as defined herein after) and executed the Mortgage.

38.     Thereafter, Plaintiffs became aware that they had been approved for a mortgage through AMNET.  Plaintiffs continued to believe that the mortgage would be a form of reverse mortgage that would allow them to acquire the equity in the Property but not pay monthly mortgage payments.  Dawson told Plaintiffs to attend the closing on the reverse mortgage that was scheduled by Dawson for May 16, 2006 at offices located at the Reckson Plaza facility, the same location as the offices of Dawson, BMG and Brash.

39.     At the closing on May 16, 2206 Plaintiffs, Dawson, a representative of Morales & Associates, P.C., the closing agent for AMNET ("Morales") and the title closer from Legacy Abstract Corp. (the "Title Closer") were present.  Pursuant to the directions and instructions of Dawson and Morales, Plaintiffs executed various documents that they were led to believe were for the closing on a reverse mortgage in the amount of $300,000.  At the closing, Dawson delivered to Plaintiffs a check in the amount of $3,600 drawn on an account of Ethan Thomas Co., Inc. and signed by Dawson.  The Ethan Thomas check recited an address identical to Dawson's Reckson Plaza office.  Dawson advised Plaintiffs that the check was for the first monthly installment that they would be receiving under the reverse mortgage.

40.     At no time during the closing did Morales or the Title Closer ever state to Plaintiffs that the loan being given by AMNET was not a reverse mortgage or that it was any other kind of mortgage, equity loan or line of credit.  Morales did not explain any aspect or details of the documents and transaction to Plaintiffs.  This failure occurred despite the fact that Morales knew that Plaintiffs were not represented by an attorney at the closing.   Plaintiffs left the closing believing that they had closed on a reverse mortgage.

41.     Further, at the closing Plaintiffs were not notified of, and are not aware of executing any document or notice acknowledging the required three day right to cancel (the "Right to Cancel") as prescribed by RESPA.  Plaintiffs were not given a written notice of the Right to Cancel at the closing.  Despite the requirements of RESPA, Plaintiffs did not receive copies of any of the documents that they executed at the closing or that were otherwise prepared by (i) CCC, the mortgage broker as identified on the Closing Statement – HUD 1 (the "Settlement Statement"), or (ii) Dawson as a mortgage broker himself, or as a disclosed or undisclosed agent for CCC.  A copy of the Settlement Statement is annexed hereto as Exhibit "C."

42.     As evidenced by the Settlement Statement, Plaintiffs paid to CCC from proceeds of the Mortgage the following: (i) $4,500 for a loan origination fee (see, Item 801); (ii) $300 for an appraisal fee (see, Item 803); (iii) $450 for an application fee (see, Item 810); and $450 for a processing fee (see, Item 811).  These fees and charges totaled $5,700 (the "CCC Fees") that Plaintiffs paid directly to CCC for the purported services it rendered to, and on behalf of Plaintiffs in connection with the Mortgage.   In addition to the CCC Fees, CCC received $6,303 as a deferred broker premium fee (see, Item 1307) from AMNET (the "Premium") based on the fact that Plaintiffs were charged a premium interest rate above AMNET's base rate (par).  Upon information and belief, in order for CCC to have received the CCC Fees, a Fee Agreement had to have been signed by CCC and Plaintiffs.

43.     The CCC Fees were, in fact, directly paid to CCC from the Mortgage proceeds for the purposes identified in the Settlement Statement.  All of the foregoing gave rise to a contractual relationship between CCC and Plaintiffs.

44.     The existence of the exorbitant Premium that was paid by AMNET to CCC is an indication that CCC selected a mortgage product that would generate the maximum possible fees

for CCC, instead of a product that would be the most suitable to Plaintiffs based on their financial circumstances.

45.     After the closing, Plaintiffs received checks from Dawson in the amount of $3,600 per month purportedly on account of the monthly payments they were to receive under the reverse mortgage.   These monthly checks continued through October 2006.   The check received in November 2006 from Dawson was dishonored by Plaintiffs' bank for insufficient funds.   Plaintiffs did not receive any further checks from Dawson or any other party on account of the purported reverse mortgage.

46.     In November 2006, for the first time Plaintiffs received a statement from WMB for a current and past due payment on a mortgage totaling $5,257.74.   Upon inquiry to WMB, Plaintiffs learned for the first time that the closing that they attended in May 2006 was not for a reverse mortgage but rather a conventional mortgage evidenced by a 30 year fixed rate mortgage note, dated May 16, 2006 (the "Note") and secured by a mortgage lien against the Property pursuant to a mortgage dated May 16, 2006  (the "Mortgage").   A copy of the Note is annexed hereto as Exhibit "D" and a copy of the Mortgage is annexed hereto as Exhibit "E."   The Mortgage states that for purposes of recording of the Mortgage, MERS is the mortgagee of record, though the Mortgage does identify the lender as AMNET with MERS as its nominee.   Apparently, the Note and Mortgage had been assigned by AMNET to WMB at some point after the May closing.

47.     The Settlement Statement prepared by Morales, as agent for AMNET, the lender, and signed by Plaintiffs and Morales at the closing, reflects that the net mortgage proceeds after deduction of settlement charges were to be distributed to Plaintiffs, as the borrowers.   The Settlement Statement stated that the loan amount was $300,000 (see, Item 1600) and that the total of the settlement charges was $15,774.27 (see, Item 1400).   The distribution amount to the borrowers was stated to be $284,225.73 (the "Distribution") (see, Item 1604).

48.     Plaintiffs did not receive the Distribution at the May 16 closing.  Plaintiffs did not

sign, and were not aware of any separate writing or document that authorized AMNET, or its

agent, Morales, to deliver the distribution to any other party.  Plaintiffs did not give any oral

authorization to AMNET or Morales to deliver the Distribution to any other party.  Plaintiffs were

not given copies of the closing documents by Morales, despite the fact that Morales was aware

that Plaintiffs were not represented by an attorney at the closing.

49.     Upon information and belief, the Distribution was obtained by Dawson, through a

scheme to transfer the funds to an entity controlled by him, possibly, BMG or Brash.  Dawson,

using blank signed checks he obtained from Plaintiffs arranged with Morales to have the

Distribution wired to Plaintiffs' account after the closing without their knowledge or approval and

then quickly withdraw the Distribution from the account using the checks.  This was all

accomplished well before the next account statement cycle and Dawson knew that Plaintiffs' bank

would not contact Plaintiffs about the transactions thus effectively barring Plaintiffs from ever

having possession or control over the Distribution.

50.     Plaintiffs have never effectively received the Distribution and never received any

consideration for the Distribution or any benefit from the Distribution.  Plaintiffs have never

received any consideration or derived any benefit from Dawson, BMG, Brash or any other entity

affiliated with or controlled by Dawson for the Distribution.  Plaintiffs have never received any

consideration from AMNET, MERS, WMB, or any of their agents, successors or assigns for the

Note delivered to AMNET, or for the Mortgage that was recorded as a lien of record against the

Property.

51.     On or about February 1, 2007, Plaintiffs notified WMB that they were rescinding the

transaction due to the failure of the lender and all of its agents, disclosed and undisclosed to

comply with (i) TILA by failing to properly distribute loan proceeds and deliver the proper loan

product, *i.e.* a reverse mortgage, and (ii) RESPA by failure to deliver all required pre-closing documents and disclosures and the closing documents at he closing, including the notice of Right to Cancel.

**AS AND FOR A FIRST CAUSE OF ACTION**
**AGAINST DEFENDANTS, WMB, AMNET, MERS, CCC and DAWSON**
**(Declaratory Relief - Failure to Comply with TILA and RESPA)**

52.     Plaintiffs repeat, restate and reallege each and every allegation contained in paragraphs 1 through 51 hereinabove with the same force as if set forth here at in full.

53.     The actions of WMB, AMNET, MERS, CCC, and Dawson constitute a failure to comply with TILA and RESPA.

54.     Prior to the closing on the transaction, AMNET, MERS and CCC, as well as Dawson, as a disclosed or undisclosed agent of CCC, the mortgage broker, and or AMNET and MERS as lender, failed to provide Plaintiff with the required pre-closing disclosure under TILA, which includes, but is not limited to, a Good Faith Estimate, a Truth in Lending Disclosure, Servicing Disclosure, names of all parties working on the transaction and notice to borrower of their right to order title.

55.     At the closing, AMNET, MERS and CCC, as well as Dawson, as a disclosed or undisclosed agent of CCC, the mortgage broker, or as a mortgage broker himself, and or AMNET and MERS as lender, and Morales, as their agent, failed to provide to Plaintiffs any closing documents, including, but not limited to, a Truth in Lending Disclosure, Itemization of Amount Financed, the Settlement Statement, Servicing Disclosure, notice of the Right to Cancel and copies of the Note and Mortgage as required under TILA and RESPA.

56.     As a result of the foregoing failures and omissions of AMNET, MERS and CCC, as well as Dawson, as a disclosed or undisclosed agent of CCC, the mortgage broker, and or AMNET and MERS as lender, Plaintiffs have the right under TILA to rescind the transaction, and

14

are entitled to have the Mortgage canceled as of record and an award of statutory penalties and attorneys fees.

### AS AND FOR A SECOND CAUSE OF ACTION
### AGAINST DEFENDANTS, WMB, AMNET, MERS and CCC
### (Breach of Fiduciary Duty)

57.     Plaintiffs repeat, restate and reallege each and every allegation contained in paragraphs 1 through 56 hereinabove with the same force as if set forth here at in full.

58.     The actions of AMNET, MERS, WMB, CCC, Dawson and Morales constitute a breach of fiduciary duty owed by the foregoing parties in their various, or multiple capacities to Plaintiffs, as the borrowers.   These included: (i) failure by AMNET to ensure the proper processing of the URLA and to ensure that it had been properly prepared, executed and submitted for consideration, to ensure that any and all required pre-closing disclosures were properly and fully prepared naming all mortgage applicants on all disclosure documents and to ensure that such disclosures were timely and properly delivered to Plaintiffs;  (ii) failure by CCC, as the mortgage broker and agent of AMNET and MERS, the lender and mortgagee under the Note and Mortgage, directly and/or  through Dawson as CCC's disclosed or undisclosed agent, or as a mortgage broker himself, and therefore agent for the lender, to properly and fully complete the URLA, to disclose to Plaintiffs that its employee and representative, Laucella, was a convicted felon, to ensure that it was properly and fully executed by Plaintiffs in all required parts, to obtain from Plaintiffs all necessary and appropriate information and documentation for the URLA, fully disclose to Plaintiffs the nature, type, terms, including interest rate and amount of the mortgage that would be applied for under the URLA, provide the proper and required pre-closing disclosures to Plaintiffs, ensure the proper processing and distribution of loan proceeds and to ensure that Plaintiffs had properly and with adequate disclosure of the nature and purpose of each, executed all documents relating to the loan process; (iii) failure by CCC, as a mortgage broker for Plaintiffs to properly

and fully render services to, or for the benefit of Plaintiffs as set forth in paragraphs 29 through 35 herein above, and to perform the tasks and actions set forth in subsection (ii) herein, on behalf of or for the benefit of Plaintiffs, including obtaining the best mortgage product for Plaintiffs rather than one that would generate the Premium, for which services CCC was paid the CCC Fees by Plaintiffs; and (iv) Morales, as the disclosed agent for AMNET, MERS, the lender and mortgagee under the Note and Mortgage, failed to perform the duties of a closing agent at the closing by not: (a) properly explaining to Plaintiffs the nature and type of loan transaction arising under and pursuant to the Note and Mortgage;  (b) explaining the obligations of Plaintiffs arising under the Note and Mortgage and the consideration being given to Plaintiffs by the lender in exchange for such obligations; (c) ensuring delivery of the Distribution to Plaintiffs at the closing as stated in the Settlement Statement;  (d) explaining to Plaintiffs the Right to Cancel and providing copies of the notice of the Right to Cancel;  (e) obtaining the written authorization of Plaintiffs for delivery of the distribution to any third party; (f) preparing a proper, correct and complete Settlement Statement; and (g) delivering a set of all closing documents to Plaintiffs at the closing.

59.     The duties set forth in paragraph 58 hereinabove, including the duty to disclose to Plaintiffs that its employee and representative, Laucella, was a convicted felon, the nature, type, terms, including interest rate and amount of the mortgage, or to provide any documents to them that would identify the mortgage product, that were not performed or were performed improperly, inadequately, incompletely, incompetently or otherwise in a deficient manner and inconsistent with mortgage banker and/or brokerage industry standards and practice were within the scope of: (i) Morales' duties and responsibilities as closing agent for the lender and mortgagee under the Note and Mortgage; and (ii) CCC's duties and responsibilities as a mortgage broker (a) as agent for the lender and mortgagee under the Note and Mortgage, and (b) as the mortgage broker for Plaintiffs.

60.     The failures of CCC and Morales to perform the duties as set forth hereinabove were negligent and in complete and gross disregard of the interests and rights of Plaintiffs and as such constituted a breach of CCC's fiduciary duties to Plaintiffs as Plaintiffs' mortgage broker and Morales' fiduciary duties to Plaintiffs as closing agent.

61.     As a disclosed agent for AMNET and MERS, and independently with respect to CCC, as a mortgage broker for Plaintiffs under a contractual relationship, the aforesaid conduct of CCC, Dawson and Morales that constituted a breach of fiduciary duty owed to Plaintiffs has harmed Plaintiffs, and with respect to those parties' conduct as agents for the lender, is attributable to AMNET and MERS, and WMB, as successor lender to AMNET, and AMNET, MERS and WMB are responsible for the negligent conduct of their agents CCC and Morales and the breach of fiduciary duties owed to Plaintiffs.

62.     Plaintiffs were materially and adversely impacted by the negligent conduct of CCC and its breach of fiduciary duty owed to Plaintiffs and the conduct and breach of duty of Morales, as agent for AMNET, MERS and WMB owed to Plaintiffs and Plaintiffs have been injured as a consequence of the recording of a mortgage lien of record against the Property in the principal amount of $300,000, for which Plaintiffs received no consideration and have been damaged in an amount to be determined at trial, but not less than the aforesaid $300,000.

### AS AND FOR A THIRD CAUSE OF ACTION
### AGAINST DEFENDANTS, WMB, AMNET AND MERS
### (Injunctive Relief)

63.     Plaintiffs repeat, restate and reallege each and every allegation contained in paragraphs 1 through 62 hereinabove with the same force as if set forth here at in full.

64.     As a result of the violations of TILA and RESPA and the breach of fiduciary duty on the part of AMNET, MERS and WMB as set forth in the First and Second Causes of Action above, and upon the failure of consideration for the Note delivered and the Mortgage granted

against the Property, WMB, AMNET, MERS, and all of their successors, assigns and beneficiaries should be permanently enjoined from seeking to recover against Plaintiffs, any monies or other consideration due or obligations arising under the Note and the Mortgage, or otherwise exercising any rights, remedies or recourse under the note or Mortgage, including, without limitation, the commencement of any action to foreclose under the Mortgage or to seek a judgment or award against Plaintiffs for any amounts under the Note.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST DEFENDANTS, WMB, AMNET AND MERS
### (Declaratory Relief)

65.    Plaintiffs repeat, restate and reallege each and every allegation contained in paragraphs 1 through 64 hereinabove with the same force as if set forth here at in full.

66.    As a result of the breach of fiduciary duty on the part of AMNET, MERS and WMB as set forth in the First Cause of Action above, and upon the failure of consideration for the Note delivered and the Mortgage granted against the Property, Plaintiffs are entitled to a declaratory judgment voiding the Note and vacating the Mortgage as a lien of record against the Property.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST DEFENDANTS, WMB, AMNET AND MERS
### (Declaratory Relief-TILA Violation)

67.    Plaintiffs repeat, restate and reallege each and every allegation contained in paragraphs 1 through 66 hereinabove with the same force as if set forth here at in full.

68.    As a result of Plaintiffs not receiving the notice of Right to Cancel at the closing their rights under TILA were violated.

69.    The violation of the noticing requirements under TILA regarding the Right to Cancel provides an absolute right to Plaintiffs to cancel and rescind the loan transaction arising under the Note and Mortgage without any cost, expense or liability and the Mortgage shall be vacated as a lien of record against the Property.

70.     Accordingly, pursuant to TILA, Plaintiffs are entitled to a declaratory judgment voiding the Note and vacating the Mortgage as a lien of record against the Property, without liability to any party.

## AS AND FOR A SIXTH CAUSE OF ACTION
## AGAINST DEFENDANTS DAWSON, BMG AND BRASH
### (Breach of Contract)

71.     Plaintiffs repeat, restate and reallege each and every allegation contained in paragraphs 1 through 70 hereinabove with the same force as if set forth here at in full.

72.     Dawson, BMG and Brash assumed contractual duties and obligations to Plaintiffs with respect to Plaintiffs' in the providing of professional financial, investment, mortgage brokerage and management advice and services to Plaintiffs.

73.     As a result of the advise, direction and actions of Dawson, BMG and Brash given to, or taken with respect to Plaintiffs concerning their financial and investment matters, Dawson, BMG and Brash breached their contractual duties and obligations to Plaintiffs.

74.     As a result of the foregoing described breach of contract, Dawson, BMG and Brash are liable to Plaintiffs in an amount to be determined at trial, but in no event less than: (i) $11,532, plus interest and lost opportunity amounts; and (ii) any and all amounts that Plaintiffs may be liable for arising under, or related to the Note and Mortgage.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## AGAINST DEFENDANTS DAWSON, BMG AND BRASH
### (Misappropriation and Conversion)

75.     Plaintiffs repeat, restate and reallege each and every allegation contained in paragraphs 1 through 74 hereinabove with the same force as if set forth here at in full.

76.     Plaintiffs entrusted Dawson, BMG and Brash with substantial funds and the management of their assets and financial affairs.

77.     Upon information and belief, Dawson, BMG and Brash misappropriated and converted certain funds delivered to them by Plaintiffs that were to be invested on behalf of Plaintiffs upon the recommendation and advice of Dawson, BMG and Brash.

78.     Upon information and belief, Dawson, BMG and Brash utilized the misappropriated and converted funds delivered to them by Plaintiffs for their own benefit or purpose and Plaintiffs did not receive any benefit or consideration as a result of said misappropriation and conversion by Dawson, BMG and Brash.

79.     As a result of the foregoing described acts of misappropriation and conversion, Dawson, BMG and Brash are liable to Plaintiffs in an amount to be determined at trial, but in no event less than: (i) the Balance plus interest and lost opportunity amounts; and (ii) any and all amounts that Plaintiffs may be liable for arising under, or related to the Note and Mortgage.

### AS AND FOR A EIGHTH CAUSE OF ACTION
### AGAINST DEFENDANTS DAWSON, BMG AND BRASH
### (Fraud and Misrepresentation)

80.     Plaintiffs repeat, restate and reallege each and every allegation contained in paragraphs 1 through 79 hereinabove with the same force as if set forth here at in full.

81.     Dawson, BMG and Brash's misappropriation and/or conversion of certain property, funds and assets of Plaintiffs, as described hereinabove and their failure to property safeguard, protect, segregate and maintain said property, funds and assets in the name of, or for the benefit of Plaintiffs constitutes fraud and misrepresentation.

82.     As a result of the foregoing described acts of misappropriation and conversion, Dawson, BMG and Brash are liable to Plaintiffs in an amount to be determined at trial, but in no event less than: (i) the Balance, plus interest and lost opportunity amounts; and (ii) any and all amounts that Plaintiffs may be liable for arising under, or related to the Note and Mortgage.

## AS AND FOR AN NINTH CAUSE OF ACTION
## AGAINST DEFENDANTS DAWSON, BMG AND BRASH
### (Breach of Fiduciary Duty)

83.     Plaintiffs repeat, restate and reallege each and every allegation contained in paragraphs 1 through 82 hereinabove with the same force as if set forth here at in full.

84.     Dawson, BMG and Brash assumed fiduciary duties and obligations to Plaintiffs as a result of their rendering of professional financial, investment, mortgage brokerage and management advice and services to Plaintiffs.

85.     By virtue of the conduct and actions of Dawson, BMG and Brash as described herein above, Dawson, BMG and Brash breached such fiduciary duties and obligations to Plaintiffs.

86.     As a result of the foregoing described acts of misappropriation and conversion, Dawson, BMG and Brash are liable to Plaintiffs in an amount to be determined at trial, but in no event less than: (i) the Balance, plus interest and lost opportunity amounts; and (ii) any and all amounts that Plaintiffs may be liable for arising under, or related to the Note and Mortgage.

## AS AND FOR AN TENTH CAUSE OF ACTION
## AGAINST DEFENDANTS DAWSON, BMG AND BRASH
### (Accounting)

87.     Plaintiffs repeat, restate and reallege each and every allegation contained in paragraphs 1 through 86 hereinabove with the same force as if set forth here at in full.

88.     Dawson, BMG and Brash are in possession or control of, or have disposed of property, funds and assets of Plaintiffs.

89.     Despite prior demand made upon Dawson BMG and Brash by or on behalf of Plaintiffs, Dawson, BMG and Brash have failed or refused to account for said property, funds and assets of Plaintiffs.

90.     As a result, Dawson, BMG and Brash should be directed and ordered to provide to Plaintiffs a full written accounting of all property, funds and assets of Plaintiffs that are, or have

been in the possession or control of Dawson, BMG and Brash, or any of their officers, employees, agents, representatives or assignees.

**WHEREFORE**, Plaintiffs demands judgment as follows:

(1) On the First Cause of Action for declaratory relief for failure to comply with TILA and RESPA, rescission of the Transaction pursuant to TILA, avoiding of the Mortgage lien of record, statutory penalties and statutory attorneys fees;

(2) On the Second Cause of Action for breach of fiduciary duty an amount to be determined at trial against defendants, MERS, AMNET, WMB, but not less than $300,000;

(3) On the Third Cause of Action for injunctive relief, an order permanently enjoining MERS, AMNET, WMB from seeking to recover any monies or other consideration due or obligations arising under the Note and the Mortgage, or otherwise exercising any rights, remedies or recourse under the note or Mortgage, including, without limitation, the commencement of any action to foreclose under the Mortgage or to seek a judgment or award against Plaintiffs for any amounts under the Note;

(4) On the Fourth Cause of Action for declaratory judgment, a judgment voiding the Note and vacating the Mortgage as a lien of record against the Property;

(5) On the Fifth Cause of Action for declaratory judgment, a judgment pursuant to TILA rescinding the Transaction, voiding the Note and vacating the Mortgage as a lien of record against the Property;

(6) On the Sixth Cause of Action for breach of contract, an award against Dawson, BMG and Brash in an amount to be determined at trial, but in no event less than:

(i) the Balance, plus interest and lost opportunity amounts; and (ii) any and all amounts that Plaintiffs may be liable for arising under, or related to the Note and Mortgage;

(7) On the Seventh Cause of Action for misappropriation and conversion, an award against Dawson, BMG and Brash in an amount to be determined at trial, but in no event less than: (i) the Balance, plus interest and lost opportunity amounts; and (ii) any and all amounts that Plaintiffs may be liable for arising under, or related to the Note and Mortgage;

(8) On the Eighth Cause of Action for fraud and misrepresentation, an award against Dawson, BMG and Brash in an amount to be determined at trial, but in no event less than: (i) the Balance, plus interest and lost opportunity amounts; and (ii) any and all amounts that Plaintiffs may be liable for arising under, or related to the Note and Mortgage;

(9) On the Ninth Cause of Action for breach of fiduciary duty,  an award against Dawson, BMG and Brash in an amount to be determined at trial, but in no event less than: (i) the Balance, plus interest and lost opportunity amounts; and (ii) any and all amounts that Plaintiffs may be liable for arising under, or related to the Note and Mortgage;

(10) On the Tenth Cause of Action for accounting, an order directing Dawson, BMG and Brash to provide to Plaintiffs a full written accounting of all property, funds and assets of Plaintiffs that are, or have been in the possession or control of Dawson, BMG and Brash, or any of their officers, employees, agents, representatives or assignees; and

(11) An award to Plaintiffs of costs and disbursements of this action to be paid by

and among the defendants as determined by the Court and such other and further

relief as this Court may deem just and proper.


Dated: Westbury, New York
       June 9, 2008

                             SCOTT A. ROSENBERG, P.C.
                             Attorneys for Plaintiffs,
                             Anthony Iannuzzi and Theresa Iannuzzi

                         By: _____
                             Kevin R. Toole, Esq. (KT-7700)
                               Of Counsel
                           265 Post Avenue, Suite 120
                           Westbury New York 11590
                           (516) 877-7205