UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

N° 07-CV-964 (JFB) (WDW)
_____

ANTHONY IANNUZZI AND THERESA IANNUZZI,

Plaintiffs,

VERSUS

WASHINGTON MUTUAL BANK, AMERICAN MORTGAGE NETWORK, INC., D/B/A
AMNET MORTGAGE, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,
CUSTOM CAPITAL CORP., PETER J. DAWSON, BMG ADVISORY SERVICES, LTD.,
BRASH MANAGEMENT GROUP, LTD., 21ST CENTURY FINANCIAL SERVICES AND
INVEST FINANCIAL SERVICES.

Defendants.
_____

MEMORANDUM AND ORDER
August 21, 2008
_____

JOSEPH F. BIANCO, District Judge:

Plaintiffs Anthony Iannuzzi and Theresa Iannuzzi bring this lawsuit against Washington Mutual Bank ("WaMu"), American Mortgage Network, Inc., d/b/a AMNET Mortgage ("AmNet"), Mortgage Electronic Registration Systems, Inc. ("MERS"), Custom Capital Corp. ("CCC"), and Peter J. Dawson ("Dawson") alleging failure to comply with the Truth In Lending Act ("TILA") and Real Estate Settlement Procedures Act ("RESPA"). Additionally, plaintiffs assert a state law claim for breach of fiduciary duty against WaMu, AmNet, MERS, and CCC. Plaintiffs also have brought claims against Dawson, BMG Advisory Services, Ltd. ("BMG"), and Brash Management Group, Ltd. ("Brash") for the following: (1) breach of contract; (2) misappropriation and conversion; (3) fraud and misrepresentation; and (4) breach of fiduciary duty. Finally, plaintiffs also asserted a claim against 21st Century Financial Services ("21st Century") and Invest Financial Services ("IFS") for failure to supervise Dawson under the theory of *respondeat superior*.

WaMu, AmNet and MERS (collectively, "AmNet Defendants") have asserted cross-claims against Dawson, BMG, Brash, 21st Century, IFS and CCC for indemnity and contribution. Additionally, the AmNet Defendants assert a cross-claim against

Dawson for conversion and a cross-claim against CCC for breach of contract.

Defendant CCC moves for a judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), as to plaintiffs' claims and AmNet Defendants' cross-claims. As set forth below, having fully considered the motion, the Court concludes the following: (1) CCC's motion to dismiss plaintiffs' TILA claim against CCC is granted; (2) CCC's motion to dismiss plaintiffs' breach of fiduciary duty claim against CCC is denied; (3) CCC's motion to dismiss AmNet Defendants' cross-claim for common law contribution is denied; and (4) CCC motion to dismiss AmNet defendants' cross-claim for contractual indemnification is denied.[1]

I. BACKGROUND

A. Facts

The following facts are taken from the Amended Complaint and are not findings of fact by the Court. The Court assumes these facts to be true for the purpose of deciding this motion and construes them in the light most favorable to the non-moving party.

1. Iannuzzi Claims

Plaintiffs Anthony and Theresa Iannuzzi are husband and wife and reside at 209 Fulton Street, Westbury, New York. (Amended Complaint ("Compl.") ¶ 1.) Plaintiffs began using Dawson approximately 15 years ago to prepare their federal and state tax returns. (Compl. ¶ 18.) After a period of years while Dawson was preparing their tax returns, he began to discuss with plaintiffs possible investments that he could place them in. (Compl. ¶ 19.) Starting in 2000, plaintiffs turned over certain monies to Dawson for the purpose of having him establish an investment plan for them. (Compl. ¶ 19.) In early 2006, Dawson discussed with plaintiffs the possibility of them obtaining a reverse mortgage on their personal property at 209 Fulton Street (the "Property"). (Compl. ¶ 24.) A reverse mortgage is a form of mortgage that enables certain homeowners, usually retired individuals or senior citizens, to draw the equity from their property in the form of monthly payments. (Compl. ¶ 24.) Based on Dawson's recommendation and the information provided to them regarding reverse mortgage programs, plaintiffs decided to go through Dawson to obtain a reverse mortgage. (Compl. ¶ 25.) Dawson advised plaintiffs that he would make arrangements for plaintiffs to work with a mortgage broker that Dawson had a working relationship with. (Compl. ¶ 25.) Plaintiffs believed that Dawson was acting as a mortgage broker, or as a loan officer for a mortgage broker, in the proposed reverse mortgage transaction. (Compl. ¶ 25.)

In addition to the initial discussions with Dawson regarding a possible mortgage, Dawson introduced plaintiff Anthony Iannuzzi to Michael Laucella ("Laucella") of CCC at Dawson's offices. (Compl. ¶ 26.) Dawson told Anthony Iannuzzi that he had a working relationship with CCC and that Laucella would handle the mortgage process for plaintiffs. (Compl. ¶ 26.) Dawson and CCC transacted approximately 18 mortgages

---

[1] At oral argument, counsel for AmNet Defendants made clear that they are not seeking to assert a cross-claim for common law indemnification, but rather are asserting a cross-claim for contractual indemnification. (Oral Arg. Tr. 22.)

2

for clients of Dawson prior to the Iannuzzi transaction. (Compl. ¶ 27.) When referring mortgage clients to CCC, Dawson only dealt with Laucella. (Compl. ¶ 27.) Plaintiffs were never informed that Laucella was a convicted felon who had served prison terms for securities and other financial crimes prior to his becoming employed by CCC. (Compl. ¶ 27.)

During the communications with CCC, plaintiffs were asked a limited number of superficial questions that did not encompass the scope of the information or documentation that would be required to fully complete an application for a mortgage of any kind. (Compl. ¶ 29.) At no time did anyone from CCC make any other request, written or oral, to plaintiffs for any information related to an application for a mortgage. (Compl. ¶ 29.) Further, at no time did Laucella or any other person at CCC advise plaintiffs of Dawson's continued participation in the mortgage process after Dawson's initial introduction of Laucella to Anthony Iannuzzi. (Compl. ¶ 29.) Based upon Dawson's statements to them and the conduct of Laucella in the discussion he had with Anthony Iannuzzi, plaintiffs had the understanding that CCC was acting as their mortgage broker to obtain the best possible reverse mortgage product for them. (Compl. ¶ 30.)

Plaintiffs believed that CCC would provide the following services: (i) discussing with plaintiffs the nature, type and amount of the mortgage product that would be obtained and selecting the best possible mortgage product for plaintiffs given plaintiffs' circumstances; (ii) locating a lender; (iii) properly and fully preparing the URLA and any other information related thereto; (iv) confirming to plaintiffs that the URLA had been submitted to the lender; (v) disclosing to plaintiffs the existence of the CCC fees and that they would be charged to plaintiffs; and (vi) advising plaintiffs when a mortgage had been approved. (Compl. ¶ 31.)

At no time in the lending process did plaintiffs receive from Dawson, CCC or any other party, including AmNet and its agents, disclosed or undisclosed, any information or documents pertaining to the proposed transaction, including but not limited to a (i) Good Faith Estimate of Fees, (ii) Truth in Lending Disclosure, (iii) Commitment Letter, (iv) Broker Agreement, or (v) any other documents required prior to closing. (Compl. ¶ 36.) Thereafter, plaintiffs became aware that they had been approved for a reverse mortgage through AmNet. (Compl. ¶ 38.) Dawson advised plaintiffs that the closing on the reverse mortgage was scheduled for May 16, 2006 at the offices of 21st Century located at the Reckson Plaza facility, the same location as the offices of Dawson, BMG, and Brash. (Compl. ¶ 38.)

At the closing on May 16, 2006, plaintiffs, Dawson, a representative of Morales & Associates, P.C., the closing agent for AmNet ("Morales"), and the title closer from Legacy Abstract Corp. (the "Title Closer") were present. (Compl. 39.) Pursuant to the directions and instruction of Dawson and Morales, plaintiffs executed various documents that they were led to believe were for the closing on a reverse mortgage in the amount of $300,000. (Compl. ¶ 39.) At the closing, Dawson delivered to plaintiffs a check in the amount of $3,600 drawn on an account of Ethan Thomas Co., Inc. and signed by Dawson. (Compl. ¶ 39.) The Ethan Thomas check recited an address identical to Dawson's

3

Reckson Plaza office. (Compl. ¶ 39.) Dawson advised plaintiffs that the check was for the first monthly installment that they would be receiving under the reverse mortgage. (Compl. ¶ 39.)

At no time during the closing did Morales or the Title Closer ever state to plaintiffs that the loan being given by AmNet was not a reverse mortgage or that it was any other kind of mortgage, equity loan or line of credit. (Compl. ¶ 40.) Morales did not explain to plaintiffs any aspects or details of the documents and transaction. (Compl. ¶ 40.) This failure occurred despite the fact that Morales knew that plaintiffs were not represented by attorneys at the closing. (Compl. ¶ 40.) Plaintiffs left the closing under the belief that they had closed on a reverse mortgage. (Compl. ¶ 40.) Further, at the closing, plaintiffs were not given a written notice of the Right to Cancel at the closing. (Compl. ¶ 41.) According to the Amended Complaint, despite the requirements of RESPA, plaintiffs did not receive copies of any of the documents that they executed at the closing or that were otherwise prepared by (i) CCC, the mortgage broker as identified on the Closing Statement - HUD 1, or (ii) Dawson as a mortgage broker himself, or as a disclosed or undisclosed agent for CCC. (Compl. ¶ 41.)

The Settlement Statement indicates that plaintiffs paid to CCC from proceeds of the mortgage the following: (i) $4,500 for a loan origination fee; (ii) $300 for an appraisal fee; and (iii) $450 for an application fee. (Compl. ¶ 42.) These fees and charges totaled $5,700 (the "CCC Fees") that plaintiffs paid directly to CCC for the purported services it rendered to, and on behalf of plaintiffs in connection with the mortgage. (Compl. ¶ 42.) In addition to the CCC fees, CCC received $6,303 as a deferred broker premium fee from AmNet based on the fact that plaintiffs were charged a premium interest rate above AmNet's base rate. (Compl. ¶ 42.) Plaintiffs allege that, in order for CCC to have received the CCC fees, a Fee Agreement had to have been signed by CCC and the plaintiffs. (Compl. ¶ 42.) The CCC fees were directly paid to CCC from the mortgage proceeds for the purposes identified in the Settlement Statement. (Compl. ¶ 43.) Plaintiffs allege that the existence of the exorbitant premium that was paid by AmNet to CCC is an indication that CCC selected a mortgage product that would generate the maximum possible fees for CCC, instead of a product that would be the most suitable to plaintiffs based on their financial circumstances. (Compl. ¶ 44.)

After the closing, plaintiffs received checks from Dawson in the amount of $3,600 per month purportedly on account of the monthly payments they were to receive under the reverse mortgage. (Compl. ¶ 45.) These monthly checks continued through October 2006. (Compl. ¶ 45.) The check received in November 2006 from Dawson was dishonored by plaintiffs' bank for insufficient funds. (Compl. ¶ 45.) Plaintiffs did not receive any further checks from Dawson or any other party pursuant to the purported reverse mortgage. (Compl. ¶ 45.)

In November 2006, for the first time, plaintiffs received a statement from WMB for a current and past due payment on a mortgage totaling $5,257.74. (Compl. ¶ 46.) Upon inquiry to WMB, plaintiffs learned that the closing that they attended in May 2006 was not for a reverse mortgage, but rather a conventional mortgage evidenced by a 30-year fixed mortgage note, dated May 16,

4

2006 (the "Note") and secured by a mortgage lien against the Property pursuant to a mortgage dated May 16, 2006 (the "Mortgage"). (Compl. ¶ 46.) The Mortgage states that, for purposes of recording the Mortgage, MERS is the mortgagee of record, though the Mortgage does identify the lender as AmNet with MERS as its nominee. (Compl. ¶ 46.) Apparently, the Note and Mortgage had been assigned by AmNet to WMB at some point after the May closing. (Compl. ¶ 46.)

The Settlement Statement prepared by Morales, as agent for AmNet, the lender, and signed by plaintiffs and Morales at the closing, reflects that the net mortgage proceeds after deduction of settlement charges were to be distributed to plaintiffs, as the borrowers. (Compl. ¶ 47.) The Settlement Statement stated that the loan amount was $300,000 and that the total of the settlement charges was $15,774.27. (Compl. ¶ 47.) The distribution amount to the borrowers was stated to be $284,225.73. (Compl. ¶ 47.) Plaintiffs did not receive the distribution at the May 16 closing. (Compl. ¶ 48.) Plaintiffs did not sign, and were not aware of any separate writing or document that authorized AmNet, or its agent, Morales, to deliver the distribution to any other party. (Compl. ¶ 48.) Plaintiffs did not give any oral authorization to AmNet or Morales to deliver the distribution to any other party. (Compl. ¶ 48.) Plaintiffs were not given copies of the closing documents by Morales, despite the fact that Morales was aware that plaintiffs were not represented by counsel at the closing. (Compl. ¶ 48.)

According to the Amended Complaint, the distribution was obtained by Dawson, through a scheme to transfer the funds to an entity controlled by him, possibly BMG or Brash. (Compl. ¶ 49.) Dawson, using blank signed checks obtained from plaintiffs, arranged with Morales to have the distribution wired to plaintiffs' account after the closing without their knowledge or approval and then quickly withdrew the distribution from the account using the checks. (Compl. ¶ 49.) This was all accomplished well before the next account statement cycle and Dawson knew that plaintiffs' bank would not contact plaintiffs about the transactions, thus effectively barring plaintiffs from ever having possession or control over the distribution. (Compl. ¶ 49.) Plaintiffs have never effectively received the distribution and never received any consideration for the distribution or any benefit from the distribution. (Compl. ¶ 50.) Plaintiffs have never received any consideration or derived any benefit from Dawson, BMG, Brash, or any other entity affiliated with or controlled by Dawson for the Distribution. (Compl. ¶ 50.) Plaintiffs have never received any consideration from AmNet, MERS, WMB, or any of their agents, successors, or assigns for the Note delivered to AmNet, or for the Mortgage that was recorded as a lien of record against the Property. (Compl. ¶ 50.)

On or about February 1, 2007, plaintiffs notified WMB that they were rescinding the transaction due to the failure of the lender and all of its agents, disclosed and undisclosed, to comply with (i) TILA by failing to properly distribute loan proceeds and deliver the proper loan product, *i.e.*, a reverse mortgage, and (ii) RESPA by failing to deliver all required pre-closing documents and disclosures and the closing documents at the closing, including the Notice of Right to Cancel. (Compl. ¶ 51.)

5

2. AmNet Defendants' Cross-Claims

On or about August 1, 2005, AmNet and CCC entered into a Mortgage Broker Agreement, whereby, among other things, AmNet permitted CCC "to take mortgage applications based upon [AmNet's] program" and CCC agreed:

> "To deliver to Lender mortgage applications that are taken by Broker in accordance with all applicable federal, state and local requirements. Particularly, Broker covenants that it shall
>
> (c) comply with the Real Estate Settlement Procedures Act ("RESPA") and its Regulation X, with respect to Mortgage Loan application and settlement process."

(AmNet Cross-Claim Compl. ¶ 81.)

Pursuant to the Mortgage Broker Agreement, CCC also warranted to AmNet as follows:

> (d) Each Mortgage application has been submitted in compliance with the requirements of this broker Agreement and all applicable legal requirements. Broker has no knowledge of any circumstances or conditions with respect to any mortgage application or the related mortgaged property or loan applicant which Broker reasonably believes could be expected to cause any investor to regard such mortgage loan as an unacceptable investment, cause the mortgage loan to become delinquent or adversely affect the value or marketability of such mortgage loan. Broker has committed no act or omission that will impair or invalidate Lender's interest in, or the enforceability of, any mortgage loan. All information and documents submitted by or on behalf of a loan applicant to Broker and by Broker to Lender pursuant to this Agreement are genuine, and the information contained in such documents is true, accurate and complete to the best of Broker's knowledge.
>
> (e) Each mortgage application includes each of the documents and instruments specified by Lender and/or the applicable agency or investor to be included therewith, each of which document and instrument is, and all signatures contained thereon are, genuine and enforceable in accordance with its terms.

(AmNet Cross-Claim Compl. ¶ 82.)

AmNet Defendants allege that, if the plaintiffs' allegations are true, CCC would have breached the Mortgage Broker Agreement, specifically including, but not limited to, the Agreements, Covenants and Warranties set forth above. (AmNet Cross-Claim Compl. ¶ 83.) AmNet Defendants further allege that, pursuant to the Mortgage Broker Agreement, CCC agreed to indemnify and hold AmNet harmless due to any claims arising as a result of any breach of said Agreement by CCC as follows:

> (9) Lender Hold Harmless[:] In addition to any other remedies that the parties hereto may have at law or

6

equity, Broker shall indemnify Lender and hold lender harmless against any and all claims, loses, liabilities, costs, expenses, damages, penalties, fines and forfeitures of any kind, including but not limited to reasonable attorneys' fees, resulting from (a) the breach by Broker of any representation, warranty or covenant of this Agreement, or (b) the failure of Broker to comply with applicable legal requirements or Lender's requirements in the event that Broker fails to pay Lender any sums due hereunder, or which are owed to Lender pursuant to this section, Lender shall be permitted to offset such sums from any amounts which are due or become due to Broker pursuant to the terms of this Agreement.

(AmNet Cross-Claim Compl. ¶ 84.)

AmNet Defendants allege that, if plaintiffs should recover any damages herein against AmNet, WaMu and MERS, and/or obtain any relief against AmNet, WaMu, MERS, and/or obtain any relief against AmNet, WaMu and MERS, including but not limited to, the avoidance of the Mortgage or of the Note, when in such event, CCC will be liable to AmNet for the full amount of such sum, plus appropriate interest thereon, and reasonable attorneys fees and costs of collection as provided above, together with the costs and disbursements of this action. (AmNet Cross-Claim Compl. ¶ 85.)

B. Procedural History

On January 17, 2007, plaintiffs filed this complaint in the Supreme Court of New York, County of Nassau. On March 6, 2007, AmNet Defendants removed the case to the United States District Court for the Eastern District of New York. On April 20, 2007, CCC answered the complaint and asserted cross-claims against the AmNet Defendants, Dawson, BMG, Brash, 21st Century and IFS. On April 30, 2007, AmNet Defendants filed their answer to the complaint and cross-claims against Dawson, BMG, Brash, 21st Century, IFS, and CCC. On May 10, 2007, AmNet Defendants answered the cross-claim of CCC. On May 15, 2007, CCC answered the cross-claims of the AmNet Defendants. On August 13, 2007, plaintiffs, 21st Century and IFS entered into a settlement agreement.

On October 8, 2007, CCC moved, pursuant to Federal Rule of Civil Procedure 12(c), to dismiss plaintiffs' complaint and the cross-claims of the AmNet Defendants. On November 11, 2007, AmNet Defendants filed their opposition to CCC's motion to dismiss. On November 27, 2007, plaintiffs filed their opposition to CCC's motion to dismiss. On December 17, 2007, CCC filed its reply. Oral argument was held on May 27, 2008. During the oral argument, the Court granted plaintiffs permission to file an Amended Complaint. On June 10, 2008, plaintiff filed an Amended Complaint. CCC filed a letter moving to dismiss the Amended Complaint on July 7, 2008. On July 8, 2008, AmNet filed a letter brief in response to CCC's letter brief of July 7, 2008. On July 15, 2008, CCC filed a letter in reply to AmNet Defendants' letter of July 8, 2008.[2]

---

[2] In its reply letter, CCC objects to AmNet Defendants' letter because, among other things,, it refers to evidence from Peter Dawson's deposition transcript in another action. The Court agrees with CCC's objection. As noted *infra,* in the context of a Rule 12(c) motion to

## II. STANDARD OF REVIEW

Courts evaluate a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) under the same standard as a motion pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. *See Nicholas v. Goord*, 430 F.3d 652, 658 n.8 (2d Cir. 2005).

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The plaintiff must satisfy "a flexible 'plausibility' standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007). The Court does not, therefore, require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

"In assessing the legal sufficiency of a claim, the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference." *Zamierowski v. Nat'l R.R. Passenger Corp.*, No. 05 Civ. 9309, 2006 WL 1816377, at *4 (S.D.N.Y. June 28, 2006) (citing Fed. R. Civ. P. 10(c); *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir. 1996)).

## III. DISCUSSION

### A. Plaintiffs' Federal Claim against CCC for Violations of TILA

Plaintiffs claim that CCC violated TILA by failing to provide plaintiffs with certain documents required under TILA.[3] CCC

---

dismiss, the Court cannot consider matters outside the pleadings, such as a deposition transcript. Thus, the Court has disregarded references to that transcript that are outside the scope of the pleadings.

[3] The Amended Complaint appeared to assert a separate claim for violations of RESPA, presumably under Section 2604. However, numerous courts have held that no private right of action exists for a violation of this section. *See, e.g., Collier v. Home Plus Ass'n,* No. 43481/03, 2007 WL 4793201, at *6 (N.Y. Sup. Ct. Dec. 21, 2007) ("[I]nsofar as the complaint alleges violations of the Real Estate Settlement Procedures Act (12 USC § 2601 et seq. [RESPA]), namely 12 USC § 2603 and 12 USC § 2604, it does not set forth a viable cause of action because §§ 2603 and 2604 do not provide for a private right of action."); *see also Mercado v. Playa Realty Corp.,* No. CV 03-3427(JO), 2005 WL 1594306, at *9 (E.D.N.Y. July 7, 2005) ("[Section 2604] does not explicitly authorize a private right of action, and the Second Circuit has not ruled on whether it creates an implied private right of action. All other courts that have considered this question have refused to find an implied private right of action under the provision.); *Collins v. FMHA-USDA*, 105 F.3d 1366 (11th Cir.), *cert. denied*, 521 U.S. 1127, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997); *Campbell v. Machias Sav. Bank*, 865 F. Supp. 26, 31-32 (D. Me. 1994); *Brophy v. Chase Manhattan Mortgage Co.*, 947 F. Supp. 879, 881-83 (E.D. Pa. 1996); *Mentecki v. Saxon*

argues that plaintiffs' claim for violations of TILA must be dismissed because TILA only applies to "creditors" and CCC is not a "creditor." As set forth below, the Court agrees and dismisses the TILA claim against CCC.

The purpose of TILA is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid uniformed use of credit." 15 U.S.C. § 1601 (a). TILA imposes disclosure requirements on "creditors" defined in 15 U.S.C. § 1602 (f) as a person who both: (1) "regularly extends, whether in connection with loans, sales of property, or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required," and (2) "is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of the indebtedness. . ." Prior to 1982, "creditor" included "a person who regularly arranges for the extension of consumer credit." That language was omitted, however, in TILA's current definition of "creditor" as set forth above.

The Federal Reserve Board promulgated Regulation Z to assist in implementing TILA. Regulation Z defines a "creditor" as: "i) A person (A) who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a downpayment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract." 12 C.F.R. § 226.2(a)(17)(I). The last sentence of 15 U.S.C. § 1602(f) states "[a] person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 226.32 [high-cost mortgages] or one or more such credit extensions through a mortgage broker."

This Court joins the overwhelming number of other courts that have held that a mortgage broker does not qualify as a creditor under TILA.[4] *See Viernes v. Executive Mortg., Inc.,* 372 F. Supp. 2d 576, 580-82 (D. Haw. 2004) (discussing TILA's definition of "creditor" and concluding that

---

*Mortgage, Inc.*, No. Civ. A. 96-1629-A, 1997 WL 45088, at *4 (E.D.Va. Jan.10, 1997)." ); *Cohen v. J.P Morgan Chase & Co.,* No. CV-04-4098, 2006 WL 20596, at *3 (E.D.N.Y. Jan. 4, 2006), *vacated and remanded on other grounds*, 2007 WL 2231106 (2d Cir. Aug. 6, 2007)(noting that "[t]he prior version of § 2604 contained a provision for a private right of action, Pub.L.No. 93-533 § 6, 88 Stat. 1158 (1974), but that provision was eliminated when Congress amended the statute in 1976. Pub.L.No. 94-205 § 5, 88 Stat. 1726 (1976)"). *See generally McAnaney v. Astoria Financial Corp.*, 357 F. Supp. 2d 578, 591 (E.D.N.Y. 2005) ( holding that no private right of action exists as to Section 2609 of RESPA because it was not specifically provided for in the statute). In their opposition brief, plaintiffs appeared to abandon any separate RESPA cause of action against CCC and, during oral argument, counsel for plaintiffs confirmed that they were not asserting a separate claim under RESPA. (Oral Argument Tr. 4:8-21, May 27, 2008.)

[4] Because of the general absence of applicable TILA case law in the Second Circuit on this issue, district courts have looked for guidance on this issue in other circuits. *See Diaz v. Paragon Motors of Woodside, Inc.,* 424 F. Supp. 2d 519, 529 n.17 (E.D.N.Y. 2006); *see generally Ringenback v. Crabtree Cadillac-Oldsmobile, Inc.,* 99 F. Supp. 2d 199 (D. Conn. 2000).

9

the defendant mortgage broker was not a creditor within the meaning of TILA because broker did not regularly extend consumer credit and was not the person to whom the loan obligation is payable); *Robey-Harcourt v. Bencorp Fin. Co.,* 326 F.3d 1140, 1142-43 (10th Cir. 2003)*; Wilson v. Homecomings Fin. Network, Inc.,* 407 F. Supp. 2d 893, 896 (N.D. Ohio 2005); *Noel v. Fleet Fin.,* 971 F. Supp. 1102, 1109 (E.D. Mich. 1997); *Sweeney v. Savings First Mortg., LLC*, 388 Md. 319, 879 A.2d 1037, 1046-48 (2005) (finding that "[o]ne thing is certain, mortgage brokers are not included in the definition of 'creditor' under the TILA" and therefore holding that TILA does not preempt state laws that regulate mortgage brokers).

In the instant case, plaintiffs do not allege that CCC was a party to the loan or acted as a "creditor" under TILA; rather, the allegation is that CCC acted as a mortgage broker. In fact, the Amended Complaint makes clear that AmNet was the creditor or lender at the time of the Mortgage Agreement. Because CCC did not function as a creditor or lender in the transaction, it cannot be held liable under TILA.[5] Accordingly, the TILA claim against CCC is dismissed.

### B Plaintiffs' State Claim against CCC for Breach of Fiduciary Duty

CCC argues that plaintiffs' claim against CCC for breach of fiduciary duty must be dismissed because no fiduciary duty existed between CCC, as the mortgage broker, and plaintiffs, as the borrowers. As set forth below, the Court disagrees and concludes that, at the motion to dismiss stage, this claim cannot be dismissed based upon the allegations in the Amended Complaint that

---

[5] Although plaintiffs attempt to argue that CCC can be held liable under TILA to plaintiffs because it took on these TILA disclosure requirements through its contract with AmNet, the Court disagrees with that assertion. Plaintiffs were not a party to the contract between CCC and AmNet Defendants and plaintiffs were clearly not intended to be third-party beneficiaries of that agreement. Therefore, the agreement between CCC and AmNet does not create any additional rights for plaintiffs and does not give plaintiffs the ability to recover for any alleged failure by CCC to comply with TILA obligations it allegedly agreed to satisfy under the agreement. Similarly, to the extent that plaintiffs suggest that CCC could have been acting as an agent of AmNet as it relates to these TILA requirements, the Court concludes that such an alleged agency relationship would not create a TILA cause of action against CCC. In other words, although a principal can potentially be liable for the acts committed by its agent, an agent is not liable to a third party for legal requirements that are imposed on the principal. Accordingly, plaintiffs' attempt to create TILA liability against a mortgage broker – based either on an alleged agency relationship between the broker and creditor and/or the terms of an agreement between the broker and creditor – fails as a matter of law.

CCC acted beyond the scope of a mortgage broker in the instant case.

Under New York law, the elements of a breach of fiduciary duty claim are: (1) the existence of a fiduciary duty; and (2) the breach of that fiduciary duty. *See Russo v. Banc. of Am. Sec.*, LLC, No. 05 Civ. 2922, 2007 WL 1946541, at *8 (S.D.N.Y. June 28, 2007). The determination of whether a fiduciary duty exists cannot be determined "by recourse to rigid formulas." *Scott v. Dime Sav. Bank*, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995). "When examining whether a fiduciary relationship exists under New York law, a court examines 'whether one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first.'" *Teachers Ins. & Annuity Ass'n of Am. v. Wometco Enters.*, 833 F. Supp. 344, 349-50 (S.D.N.Y. 1993); *see also Mandelblatt v. Devon Stores,* 521 N.Y.S.2d 672, 676 (N.Y. App. Div. 1987) ("'A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' (quoting Restatement (Second) of Torts § 874, comment a)").

New York Courts have generally held that a fiduciary duty does not exist between mortgage brokers and borrowers. *See, e.g., Wint v. ABN Amro Mortgage Group, Inc.,* 800 N.Y.S.2d 411, 413 (N.Y. App. Div. 2005); *Lum v. New Century Mortgage Corp.,* 800 N.Y.S.2d 408, 410 (N.Y. App. Div. 2005); *Fisher v. Equicredit*, 800 N.Y.S.2d 407, 408 (App. Div. 2005); *see also Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 940 (2d Cir. 1998) ("[u]nder New York law, as generally, there is no general fiduciary duty inherent in an ordinary broker/customer relationship"); *Vera Muller-Paisner v. TIAA-CREF Enters.,* 446 F. Supp. 2d 221, 230 (S.D.N.Y. 2006) ("[I]nsurance brokers and companies generally do not owe a fiduciary duty to those they insure."). However, as CCC recognized in its papers and at oral argument, a broker may take on a fiduciary duty by performing tasks and/or taking on obligations beyond that of an independent broker or traditional middleman. *See, e.g., Baii Banking Corp. v. UPG, Inc.,* No. 86 Civ. 5544, 1990 WL 160889, at *5 (S.D.N.Y. Oct. 17, 1990); *see also Ne. Gen. Corp. v. Wellington Adver., Inc.,* 82 N.Y.2d 158, 163, 604 N.Y.S.2d 1, 4 (1993) ("[t]he dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature 'finder' or 'broker' or even 'agent,' but instead by the services agreed to under the contract between the parties.").

In the instant case, plaintiffs allege in the Amended Complaint that CCC acted in a manner that was outside the scope of an independent mortgage broker and, thus, can be held liable for breach of a fiduciary duty to plaintiffs. Specifically, plaintiffs have asserted two theories of liability against CCC under this claim and the Court concludes that the claim, under either theory, is sufficient to withstand a motion to dismiss.

First, plaintiffs allege that Dawson is a disclosed or undisclosed agent of CCC. (Compl. ¶ 54.) Specifically, plaintiffs allege that: (i) Dawson advised plaintiffs that he would set them up with a mortgage broker he had a "working relationship" with, that broker being Laucella of CCC; (ii) Dawson and CCC had transacted approximately 18 mortgages for clients of Dawson prior to Dawson introducing Laucella to the Iannuzzis; and (iii) Laucella was introduced to the Iannuzzis at Dawson's office. (Compl. ¶¶ 26, 27, 28.) Although CCC contends that plaintiffs have failed to allege sufficient evidentiary detail to establish the existence of

an agency relationship between Dawson and CCC, such evidentiary pleading is not required at the motion to dismiss stage. Plaintiffs have stated a plausible claim for breach of fiduciary duty based on Dawson acting as an agent for CCC and, thus, such claim survives a motion to dismiss.

Second, the fiduciary duty claim also survives based upon the allegations that CCC (through its employee, Laucella) made representations to plaintiffs and engaged in conduct that transformed a traditional broker-relationship into one that involved a fiduciary duty. Plaintiffs allege that the actions of CCC, through Laucella and Dawson, take the relationship outside of the normal mortgage broker-borrower context. In particular, plaintiffs allege that the following services would be provided by CCC on their behalf: (i) discussing with plaintiffs the nature, type and amount of mortgage product that would be obtained and selecting the best possible mortgage product for plaintiffs given plaintiffs' circumstances; (ii) locating a lender; (iii) properly and fully preparing the URLA and any other information related thereto; (iv) confirming to plaintiffs that the URLA had been submitted to a lender; (v) disclosing to plaintiffs the existence of the CCC fees and that they would be charged to plaintiffs; and (vi) advising plaintiffs when a mortgage had been approved. (Compl. ¶ 31.) Although CCC correctly notes that many of the allegations in the Amended Complaint relate to conduct and services by CCC that are part of a typical mortgage broker-client relationship, some of the allegations in the Amended Complaint allege conduct by CCC that goes beyond that of an independent broker. For example, plaintiffs allege that CCC took on tasks relating to acquiring information and documents relating to the mortgage process and inserting information into the URLA on behalf of plaintiffs, without any review by plaintiffs. (Compl. ¶¶ 30, 31, 35.) In other words, plaintiffs argue that "[b]y taking control of the application process and not permitting Plaintiffs to prepare, review and authenticate all information in the URLA CCC took on the duty of managing an important aspect of plaintiff's financial affairs – the obtaining of a proper mortgage that would satisfy their needs, that being a reverse mortgage." (Plaintiffs' Letter dated July 7, 2008, at 3.) The Court concludes that the Amended Complaint sufficiently alleges that CCC engaged in conduct, as well as made representations to plaintiffs, that created a fiduciary relationship with plaintiffs. Of course, it is entirely unclear at this juncture whether discovery will reveal facts sufficient to support the existence of such a relationship and CCC will have the opportunity to raise this issue again, if it chooses, in a summary judgment motion. However, the claim is sufficiently pled for purposes of a motion to dismiss.

Accordingly, the Court denies CCC's motion to dismiss plaintiffs' breach of fiduciary duty claim against CCC.

### C. AmNet Defendants' Cross-Claim Against CCC for Common Law Contribution

CCC argues that the AmNet Defendants' cross-claim for contribution must be dismissed because contribution is unavailable for entirely economic losses resulting from a breach of contract. AmNet Defendants contend, however, that this case is not just a breach of contract claim resulting in economic losses because plaintiffs also allege that Dawson and CCC perpetrated a fraud upon plaintiffs. As set forth below, the Court concludes that the contribution cross-claim cannot be dismissed at this juncture because

plaintiffs, in addition to asserting breach of contract, have alleged that they were victims of a massive fraud and seek to hold CCC and AmNet Defendants responsible for such fraud through, among other things, a tort claim for breach of fiduciary duty.

Pursuant to New York C.P.L.R. § 1401, "two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought." S*ee Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 249 (2d Cir. 1988) ("[S]ection 1401 creates a right of contribution only among joint tortfeasors."). The New York Court of Appeals has made clear that "purely economic loss resulting from a breach of contract does not constitute 'injury to property' within the meaning of New York's contribution statute. . . ." *Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 26 (1987).

In the instant case, plaintiffs are not simply alleging breach of contract. Instead, the Amended Complaint asserts, among other things, a massive fraud in which plaintiffs were led to believe that they were entering into a transaction for a reverse mortgage, but that a standard mortgage application was fraudulently submitted by Dawson and CCC on their behalf. In connection with this scheme, plaintiffs allege that (1) CCC had plaintiffs sign a blank loan application and CCC then prepared the application and submitted it to AmNet Defendants (Compl. ¶¶ 33-35); (2) Dawson, alleging acting as an agent for CCC, then misappropriated the mortgage loan proceeds (Compl. ¶¶ 49-50). Therefore, plaintiffs sue both CCC and AmNet not for breach of contract, but rather assert a tort claim for breach of fiduciary duty. *See Doe v. Roman Catholic Diocese of Rochester,* 51 A.D.3d 1392, 857 N.Y.2d 866, 867 (4th Dep't 2008) ("Breach of fiduciary duty is a tort that arises from a relationship of trust and confidence."). In fact, plaintiffs assert that a valid contract does not exist and seek to void the Promissory Note and Mortgage held by AmNet and eliminate any obligation to repay the monies loaned. In short, because the core claim against CCC and AmNet is not a breach of contract claim but rather a tort claim for breach of fiduciary duty based upon an allegedly fraudulent transaction, AmNet Defendants' cross-claim for contribution against CCC cannot be defeated at the motion to dismiss stage.

Accordingly, the motion to dismiss AmNet Defendants' cross-claim for contribution is denied.

### D. AmNet Defendants' Cross-Claim Against CCC for Contractual Indemnification

CCC argues that AmNet Defendants' claim for contractual indemnification must be dismissed because (1) CCC did not agree to undertake any disclosure duties relating to RESPA or TILA, and (2) CCC cannot be liable based upon plaintiffs' unpled theory that their signatures on the Mortgage application were forged. As discussed below, the Court disagrees and concludes that the indemnification cross-claim survives a motion to dismiss.[6]

---

[6] As noted *supra*, counsel for AmNet Defendants made clear that they are not asserting a separate cross-claim for common law indemnification, but rather are seeking indemnification based upon their agreement with CCC.

13

"A party is entitled to full contractual indemnification provided that the 'intention to indemnify can be clearly implied from the language and purposes of the entire agreement and the surrounding facts and circumstances.'" *Monaghan v. SZS 33 Assoc., L.P.,* No. 89 Civ. 4900 (RWS), 1995 WL 104083, at *3 (S.D.N.Y. Mar. 8, 1995); *see also Maternik v. Edgemere By the Sea Corp.,* No. 18148/05, 2008 WL 1056916, at *7 (N.Y. Sup. Ct. Mar. 31, 2008); *accord Drzewinski v. Atl. Scaffold & Ladder Co.,* 70 N.Y.2d 774, 777 (N.Y. 1987); *Margolin v. New York Life Ins. Co.*, 344 N.Y.S.2d 336, 338 (N.Y. 1973).

In this instance, the Mortgage Broker Agreement between CCC and Amnet provided:

> 9. Lender Hold Harmless
>
> In addition to any other remedies that the parties hereto may have at law or equity, Broker shall indemnify Lender and hold Lender harmless against any and all claims, losses, liabilities, costs, expenses, damages, penalties, fines and forfeitures of any kind, including but not limited to reasonable attorneys' fees, resulting from (a) the breach by Broker of any representation, warranty of covenant of this Agreement, or (b) the failure of Broker to comply with applicable legal requirements or Lender's requirements.

(Broker Agreement, at ¶ 9.)[7]

CCC further agreed in the Mortgage Broker Agreement to:

> (2). . . . deliver to Lender mortgage applications that are taken by Broker in accordance with all applicable federal, state and local requirements. Particularly, Broker covenants that it shall
>
> ***
>
> (c) comply with the Real Estate Settlement Procedures Act ("RESPA") and its Regulation X, with respect to the Mortgage Loan application and settlement process.

(Broker Agreement, ¶ 2.)

Under RESPA and its Regulation X, CCC plaintiffs needed to provided with a "Good Faith Estimate of Closing Costs." 24 C.F.R. § 3500.7(b). Plaintiffs allege in their complaint that they never received a copy of this document. (Compl. ¶ 39.) Although CCC has attached a copy of the Good Faith Estimate of Closing Costs to the Reply of Affidavit of Scott Kossove, the Court does not consider such evidence for purposes of a motion to dismiss. *See Zamierowski,* 2006 WL 1816377, at *5 ("In assessing the legal sufficiency of a claim, the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference.") (citing Fed. R. Civ. P. 10(c); *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 69 (2d Cir. 1996)). Therefore, AmNet Defendants have properly alleged a contractual indemnification claim based upon the alleged failure by CCC to provide the above-referenced document as required under RESPA.[8]

---

[7] The language of the Broker Agreement can be considered on this motion to dismiss because it is incorporated by reference in the pleadings.

[8] Counsel for CCC recognized the existence of this disputed issue that could not be decided on

14

AmNet Defendants have also asserted a second theory of liability against CCC for contractual indemnification based upon the alleged submission of fraudulent documents by CCC to AmNet. Specifically, as noted *supra,* the Broker Agreement provides, among other things, that "[a]ll information and documents submitted by or on behalf of a loan applicant to Broker and by Broker to Lender pursuant to this Agreement are genuine, and the information contained in such documents is true, accurate and complete to the best of Broker's knowledge." AmNet Defendants contend that, if the allegations in the complaint are true – namely, that CCC had plaintiffs sign a blank application and then submitted documents for a reverse mortgage which was contrary to plaintiffs' intention to enter into a standard mortgage – such actions would be in contravention of the representations, warranties, and covenants by CCC in the Broker Agreement and implicate the contractual indemnification provision. Based upon a review of the pleadings, the Court concludes that AmNet Defendants have properly pled a plausible cross-claim for contractual indemnification based upon the allegations in the complaint relating to the conduct and submission of documents by CCC, as well as based upon the conduct of CCC's alleged agent, Peter Dawson.

Accordingly, the motion to dismiss AmNet Defendants' cross-claim for contractual indemnification is denied.

IV. CONCLUSION

For the foregoing reasons, the CCC's motion to dismiss is (1) granted as to plaintiffs' claim against CCC for violations of TILA, (2) denied as to plaintiffs' claim for breach of fiduciary duty against CCC, (3) denied as to AmNet Defendants' cross-claim for common law contribution, and (4) denied as to AmNet Defendants' cross-claim for contractual indemnification. The parties shall proceed with discovery in accordance with the instructions of Magistrate Judge Wall.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 21, 2008
Central Islip, NY

* * *

Plaintiffs are represented by Kevin R. Toole, of Scott A. Rosenberg, P.C., 900 Merchants Concourse, Suite 208, Westbury, NY, 11590. Washington Mutual Bank and American Mortgage Network, d/b/a Amnet Mortgage, and Mortgage Electronic Registration Systems, Inc., are represented by Marianne McCarthy, of Cullen Dykman LLP, 100 Quentin Roosevelt Boulevard, Garden City, NY 11530 & John P. Foudy, of Rosner, Nocera & Ragone, LLP, 110 Wall Street 23rd Floor, New York, NY 10005. Custom Capital Corp. Is represented by Scott E. Kossove, of L'Abbate, Balkan, Colavita & Contin, 1050

---

a motion to dismiss. (*See* Oral Arg. Tr. 13 ("I don't disagree that ultimately the issue of whether or not it was provided is only something for summary judgment and not what we're here for today.").) However, counsel argued that no cross-claim could exist because of a lack of damages suffered by plaintiffs from the alleged lack of disclosure. However, the issue of the nature and scope of any damages to which plaintiffs may be entitled cannot be resolved at the motion to dismiss stage of the litigation.

Franklin Avenue, Garden City, NY 11530. Peter J. Dawson is represented by Peter J. Tomao, 225 Seventh Street, Suite 302, Garden City, NY 11530. 21st Century Financial Services is represented by Barry R. Temkin, 110 William Street, 17th Floor, New York, NY 10038.